**IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **DENIED.** [Doc. 109]

**IT IS FURTHER ORDERED** that defendants' supplemental opposition to plaintiffs' motion for partial summary judgment is **DENIED.** [Doc. 142].

**IT IS FURTHER ORDERED** that plaintiffs' motion for partial summary judgment is **GRANTED.** [Doc. 111]

**IT IS FURTHER ORDERED** that plaintiffs' motion to consider supplemental authority is **GRANTED.** [Doc. 152]

**IT IS FURTHER ORDERED** that defendants' motion to consider supplemental authority is **GRANTED.** [Doc. 160]

An appropriate judgment will accompany this memorandum and order.

**Karen WOODS, Plaintiff,**

v.

**QWEST INFORMATION TECHNOLO-GIES, f/k/a U S WEST and North-western Bell, Defendant.**

**No. 8:03CV176.**

United States District Court,
D. Nebraska.

Sept. 10, 2004.

Jill K. Harker, Harker Law Firm, Omaha, NE, for Plaintiff.

Fini J. Thomas, Tory M. Bishop, Kutak Rock LLP, Omaha, NE, for Defendant.

## MEMORANDUM AND ORDER

BATAILLON, District Judge.

This matter is before the court on defendant's motion for summary judgment, Filing No. 23. This is an action for discrimination in employment pursuant to Title VII and the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.*, and for violations of the Equal Pay Act of 1963 ("EPA"), an amendment to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 206(d)(1), and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* In her complaint, plaintiff alleges that she has been denied certain pension benefits based on her gender and pregnancy. The action involves Ms. Woods's alleged termination from employment in 1969 by reason of pregnancy. Because she was terminated before she had completed six months of employment, Woods has not been credited with her 1969 service in calculating her Term of Employment ("TOE") for purposes of receipt of pension benefits.

Defendant Qwest Information Technologies ("Qwest") asserts that it is entitled to summary judgment for the reason that the claims are barred by the applicable statutes of limitation. Qwest argues that Woods's Title VII claim is barred because its actions in 1969 predated the enactment of the Pregnancy Discrimination Act, and further argues that Woods failed to file a timely EEOC complaint when she learned in 1992 that her 1969 period of employment by Qwest would not be included in the calculation of her TOE. Defendant also claims that Woods's ERISA claims fail as a matter of law and that Qwest is not the proper party to suit under ERISA. Woods argues that the basis of her claim is not her termination in 1969, but rather Qwest's failure to include her 1969 employment to calculate her TOE in 2000 as part

of implementation of a new pension program.

On review of the parties' submissions, Filing Nos. 24, 35, 37, 50 (briefs and supplements) and 25 (indices of evidence), the court finds the motion should be denied.

## BACKGROUND

The uncontroverted evidence establishes that plaintiff Karen Woods was first hired by Northwestern Bell Telephone Company ("Northwestern Bell") on June 3, 1969, as a long distance operator. See Filing No 56, Order on Pretrial Conference at 2, Uncontroverted Facts. After she worked for Northwestern Bell for approximately five months, Ms Woods resigned from her position on November 14, 1969. *Id.* On August 20, 1973, Ms. Woods was rehired by Northwestern Bell. *Id.* After one year and seven months of employment, Ms. Woods took a maternity leave of absence beginning February 2, 1975. *Id.* The maternity leave lasted from February 2, 1975, through August 10, 1975, a total of seven months. *Id.* Following her maternity leave, Ms. Woods returned to work on August 11, 1975, and remained employed until April 2, 1978, at which time she resigned. *Id.*

Northwestern Bell rehired Woods on June 4, 1979. *Id.* Ms. Woods resigned from her position on March 8, 1982, after two years and nine months of employment and while on leave of absence. *Id.* On May 23, 1988, Woods returned to employment at U S WEST Communications, Inc., the successor to Northwestern Bell. *Id.* Effective June 30, 2000, U.S. WEST merged with Qwest Communications International, Inc., leaving Qwest as the successor corporation to U.S. WEST. *Id.*

At the time of Ms. Woods's original hiring on June 3, 1969, and on the date of her resignation on November 14, 1969, the Northwestern Bell Plan for Employees' Pensions, Disability Benefits and Death Benefits (the "Northwestern Bell Plan") was in effect. *Id.* at 3. The Northwestern Bell plan provided:

Any absence from the service without pay, other than during a period of disability benefits, or leave of absence or temporary lay-off shall be considered a break in the continuity of service unless the Board of Directors specifically authorizes the Committee to consider such absence as a leave of absence, and if any person is reemployed after such a break in the continuity of his service, his terms of employment shall be reckoned from the date of such reemployment.

*Id.* Under the Northwestern Bell Plan, the term "leave of absence" was defined as "leave formally granted in conformity with the rules of the Company." *Id.* The Northwestern Bell Plan provided for leaves of absence associated with Accident Disability (Section 5) and Sickness Disability (Section 6). *Id.* The Northwestern Bell Plan applied uniformly to and affected plan participants who had an absence in service without pay, regardless of gender or pregnancy status. *Id.* Under the terms of the Northwestern Bell Plan, Woods's employment gap of approximately three years and eight months following Woods's five months of employment in 1969 was a break in the continuity of service that could not be included in calculating Woods's Term of Employment ("TOE") date. *Id.*

Under the Qwest Plan, a plan participant "who incurs a TOE break and is subsequently reemployed shall not receive credit for any prior term of Employment even if the participant was previously vested," unless he or she meets the exceptions provided in Sections 2.4(b)(2) and (3). *Id.* at 4. Those sections of the Qwest Plan provide that absences of service longer than six months where the employee had previously completed six months of continuous service as of the time the absence

commenced may be bridged or otherwise included in calculating the employee's TOE date. *Id.* The Qwest Plan also provides that a pre-TOE break in service "will not be bridged in any case where the employee did not previously complete six months of continuous service at the time the absence commenced." *Id.* The Qwest Plan's exclusion of periods of employment that are less than six months in length does not vary depending on a Plan participant's gender or status. *Id.* On or about November 11, 1992, following her rehire in 1988, U S WEST informed Woods that her employment service from June 3, 1969, to November 14, 1969, would not be credited toward her TOE date because her initial period of service in 1969 was less than six months. *Id.* On or about May 23, 1993, U S WEST again notified Woods that she would not be credited for her 1969 employment. *Id.* On January 22, 2001, Woods requested reconsideration of Qwest's TOE date calculation that excluded her 1969 service. *Id.* On April 16, 2001, Qwest denied Woods's request for reconsideration. *Id.* On June 12, 2001, Woods appealed the decision to the Qwest Employee Benefit Committee. *Id.* On October 10, 2001, the Employee Benefit Committee denied Woods's appeal. *Id.* On April 23, 2002, Woods filed charges of discrimination with the Nebraska Equal Opportunity Commission, alleging that Qwest's refusal to bridge her 1969 employment for purposes of calculating the TOE date was discriminatory based on her gender, pregnancy status or marital status. *Id.*

Woods has shown by affidavit that she is presently employed with defendant as a systems analyst. Filing No. 35, Attachment A, Aff. of Karen Woods at 1. She was unmarried and became pregnant at about the same time she was hired by Northwestern Bell in 1969. *Id.* She worked continually for Northwestern Bell for just over five months in 1969. *Id.* She felt good, her pregnancy was going very

smoothly, and her job did not require her to do anything that could not be done by a pregnant woman. *Id.*

On November 14, 1969, seventeen days before her six-month anniversary date with the company, Woods's supervisor, Mary Ann Johnson, called Karen into her office and demanded to know if Karen was pregnant. *Id.* When Woods admitted that she was, Johnson demanded Karen's immediate resignation, stating that Northwestern Bell did not employ women who were pregnant and were not married. *Id.* at 1–2. Johnson further stated that if Karen refused to resign, Ms. Johnson would fire her. *Id.* at 2. Woods also asserts that she knew of other supervisors who allowed their supervisees to remain on the job until their sixth month of pregnancy. *Id.*

Woods gave birth to a daughter, Tracy, on January 1, 1970, nine weeks premature. *Id.* She did not return to work until August 23, 1973, because she was ashamed that she had been fired. *Id.* After that, she worked continuously until she took maternity leave on April 1, 1978. *Id.* She returned to work in June of 1979 and worked continuously until March of 1981. *Id.* at 3. She returned to work again on May 23, 1988, and she has worked continuously at Qwest since that time. *Id.*

The uncontroverted evidence shows that Qwest changed its Pay and Benefits package in 2000. *Id.* at 3. The resultant benefits package provides that employees with less than twenty years of service are given a substantially reduced pension and retirement benefits package than the employees who had twenty years of service and were labeled as "Classic U.S. West Employees." Woods was placed in the nonclassic category of employees because she was seventy-six days shy of twenty years of service. *Id.* Woods testified that if she had not been fired, she would have worked until

she had completed her second trimester of pregnancy or at least the sixteen days until her six-month anniversary. *Id.* at 4.

## DISCUSSION

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995). Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Id.* In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir.2003). Summary judgment is seldom appropriate in discrimination cases. *Heaser v. Toro*, 247 F.3d 826, 829 (8th Cir. 2001).

### a. Title VII Pregnancy Discrimination Claim

■ Title VII makes it unlawful for an employer to discharge "or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment" on the basis of the individual's sex. 42 U.S.C. § 2000e–2(a)(1). As amended by the Pregnancy Discrimination Act, the sex discrimination proscribed by Title VII includes discrimination on the basis of "pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work."[1] 42 U.S.C. § 2000e(k); *See Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431 (8th Cir.1998). To prevail on her pregnancy discrimination claim, Woods has the burden to show that she was "treated differently because of her pregnancy" or a pregnancy-related condition. *Id.* Although the PDA creates no "substantive rights to preferential treatment, and in fact 'allows employers [to] treat pregnant women as badly as they treat similarly affected but nonpregnant employees,' the converse is also true; employers must treat pregnant women as well as they treat similarly affected employees." *Id.* (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir.1994)).

Title VII provides "three hundred days after the alleged unlawful employment practice occurred" in which to file a charge with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C. § 2000e–5(e)(1); *Rowe v. Hussmann*, 381 F.3d 775 (8th Cir.2004). The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are

1. By way of background, in 1978 Congress enacted the Pregnancy Discrimination Act (PDA), amending the definitions in Title VII to clarify that discrimination "on the basis of pregnancy, childbirth, or related medical conditions" is sex discrimination under Title VII. 42 U.S.C. § 2000e(k). The action was a response to *General Elec. Co. v. Gilbert*, 429 U.S. 125, 136–38, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), which had held that a pregnancy-related exclusion in an employee disability plan did not violate Title VII. See *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). As a result of the PDA, the Title VII terms "because of sex" or "on the basis of sex" include discrimination on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k).

long past. *Delaware State College v. Ricks*, 449 U.S. 250, 256, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Assessing timeliness requires the court to identify precisely the "unlawful employment practice" of which a plaintiff complains. *Id.* at 257, 101 S.Ct. 498.

■ Qwest contends that Woods's action is time-barred, asserting that the alleged discriminatory act occurred in 1969, before the enactment of the PDA. Alternatively, it asserts that Woods was informed in 1992 that her term of employment in 1969 would not be counted in calculating her TOE and that the statute of limitations should run from that date at the latest. Woods, on the other hand, contends that she challenges Qwest's failure to include her 1969 service in the calculation of her TOE with connection with the pension and benefits plan it adopted in September 2000.

■ The Title VII limitations period commences at the time the allegedly discriminatory decision is made and communicated to the plaintiff, even where the effects of the decision do not occur until some future date or are subject to change. *Curby v. Solutia, Inc.*, 351 F.3d 868, 873 (8th Cir.2003). Woods's claim relates not to the discriminatory impact of a pre-Pregnancy Discrimination Act plan, but to the criteria adopted by Qwest in 2000 to determine eligibility under its new pension and benefit plan, essentially alleging that the bridging provisions in the defendant's pension plan were adopted in a discriminatory manner resulting in a present violation of Title VII. *Maki v. Allete, Inc.*, 383 F.3d 740, 744, 2004 WL 1961517, *3 (8th Cir. 2004). A claim under that plan could not have been brought any earlier. *See Pallas v. Pacific Bell*, 940 F.2d 1324, 1326 (9th

Cir.1991). Moreover, the Qwest Plan cannot be said to be facially neutral: the Plan will allow credit toward TOE for breaks in service for those who took disability leave for medical reasons other than pregnancy and will not allow credit for women who were terminated by reason of pregnancy instead of having been granted disability leave. *See Maki*, 383 F.3d at 744, 2004 WL 1961517 at *3 (noting allegations that a pension plan is discriminatory and results in a present violation makes the rationale of *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), inapplicable).[2] Significantly, under the Northwestern Bell Plan in effect in 1969, an absence because of disability was not considered a break in service. Accordingly, the 2000 Qwest Plan treats persons who had a break in service for pregnancy differently than those who had a break in service for a nonpregnancy disability, resulting in a present violation of Title VII. Although the act of discriminating against Woods is 1969 is not actionable, Qwest's decision to discriminate against Woods in the adoption and application of its plan in 2000 is actionable. *See id.*

The court thus finds Qwest's reclassification of employees as either "classic" or nonclassic for receipt of enhanced pension benefits in 2000, using a system tainted by earlier discrimination, amounted to a fresh violation of the PDA. *See id.; Ameritech Ben. Plan Committee v. Communication Workers*, 220 F.3d 814, 823 (7th Cir.2000) (holding that discriminatory act occurred when employer amended its plan in response to PDA but did not amend service credit for pension purposes). The Qwest Plan distinguishes between similarly situ-

---

**2.** Evans provides that when a bona fide seniority system gives present effect to a past act of discrimination, an employer is entitled to treat that past act as lawful after a plaintiff respondent fails to file a charge of discrimination within the time prescribed under the statute. *United Air Lines v. Evans*, 431 U.S. at 557–58, 97 S.Ct. 1885.

ated employees: female employees who were forced to have a break in service by reason of pregnancy under pre-PDA company policies and employees who took leave prior to 1979 for other temporary disabilities. In short, despite the intervening enactment of the PDA, in continuing to treat women who had been forced to resign because of pregnancy differently than similarly situated males, Qwest has not "'from the date of the Act forward made all [its] employment decisions in a wholly nondiscriminatory way.'" *Maki*, 383 F.3d at 744, 2004 WL 1961517 at *2 (quoting *Bazemore v. Friday*, 478 U.S. 385, 396 n. 6, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)). Ms. Woods has established that the allegedly discriminatory acts—the adoption of discriminatory bridging provisions—occurred long after the PDA was passed. *See id.* Woods did not receive final notification that her previous employment would not be credited under the Qwest's new plan until October 2001. Woods's EEO claim was filed on April 24, 2002, well within the 300–day period. Accordingly, Woods's filing of an EEO complaint with respect to Qwest's denial was timely.[3]

### b. Equal Pay Act Claim

An EPA claim must be brought within two years of the alleged discriminatory conduct unless the conduct was wilful, in which case the claim must be brought within three years. 29 U.S.C. § 255(a). Again, defendant contends that the Equal Pay Act claims are untimely because they are actually claims concerning denials of service credit that accrued in either 1969 or 1992, at the latest. As noted above, Woods challenges defendant's current method of calculating benefits under the pension plan adopted in 2000. Thus, the

court finds defendant's' EPA and FLSA claims are timely.

### c. ERISA Claim

■ Qwest asserts that Woods's claims under ERISA are untimely and are addressed to the wrong party. First, Qwest's assertion that Woods has sued the wrong party lacks merit. The principal object of ERISA is "to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). There is no dispute that the plan at issue is an "employee welfare benefit plan" under ERISA. *See* 29 U.S.C. § 1003; 1002(2)(A). Similarly, there is no dispute that Qwest is the employer. Under ERISA, the employer is presumptively a plan sponsor. 29 U.S.C. § 1002(16)(B). The term "plan administrator" means "the person specifically so designated by the terms of the instrument under which the plan is operated or if an administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A). Thus, ERISA provides that if an employer has no plan document designating a plan administrator, the employer is the plan administrator. *See* 29 U.S.C. § 1002(16)(A)(ii) & (B)(I). Qwest has shown that the Employee Benefits Committee is the entity identified in the Plan as the Plan's administrator and that it has discretion to administer the Plan. Filing No. 25, Ex. 1, Attachment 2, Qwest Plan at 170.

■ Actions under ERISA are governed by the federal common law of agency. *See Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 n. 15 (7th Cir.1998); *Anderson v. International Un-*

---

**3.** The court expresses no opinion on whether Woods's claim is premature. *See Maki*, 383 F.3d at 745, 2004 WL 1961517 at *3–4 (holding that the statute of limitations period begins to run "when the allegedly discriminato-ry pension plan [is] applied to the plaintiffs" and leaving determination of the actual date the statute begins to run on each claim to the district court).

ion, *United Plant Guard Workers of Am.*, 150 F.3d 590, 592–93 (6th Cir.1998); *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 259–60 (4th Cir.1997); *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 988 (3d Cir.1995); *see also Union Pacific R.R. v. Beckham*, 138 F.3d at 330 (applying federal common law to ERISA statute of limitations issue). Under federal common law agency principles, the Employee Benefits Committee is Qwest's agent. *See, e.g., Lerohl v. Friends of Minnesota Sinfonia*, 322 F.3d 486, 489 (8th Cir.2003) (applying a nonexhaustive list of factors derived primarily from the Restatement (Second) of Agency as federal common law of agency).

■ ERISA provides "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument [that] shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). "Named fiduciary" means "a fiduciary who is named in the plan instrument, or who is identified as a fiduciary by the employer pursuant to a procedure specified in the plan." *Id.*, § 1102(a)(2). An entity is also "a fiduciary with respect to a Plan" if it exercises any discretionary authority or discretionary control respecting management or disposition of assets, or has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1105. ERISA further provides that fiduciaries can allocate fiduciary responsibilities and designate persons to carry out fiduciary responsibilities. *See id.*, § 1105(c)(1). Thus, any entity with discretionary authority over benefit determinations is a fiduciary. *See Aetna Health Inc. v. Davila*, —— U.S. ——, 124 S.Ct. 2488, 2502, 159 L.Ed.2d 312 (2004).

The Plan grants Qwest's Employee Benefits Committee powers, duties, and discretion to administer the Plan. According-

ly, the court finds the Employee Benefits Committee acted as either an ERISA fiduciary or its agent in exercising these discretionary duties for the employer. *See* 29 U.S.C. § 1002(21)(A); *Kerns v. Benefit Trust Life Ins. Co.*, 992 F.2d 214, 216–17 (8th Cir.1993). The court finds Qwest's Employee Benefits Committee was an ERISA fiduciary in exercising discretionary duties over plan interpretation in connection with Woods's claim. The employee benefit plan itself is ordinarily liable for benefits payable under the terms of the plan and is thus the primary defendant in an action to enforce ERISA rights. *See* 29 U.S.C. § 1132(d)(1) (identifying employee benefit plan as entity subject to suit); *Ross v. Rail Car Amer. Group. Disab. Income Plan*, 285 F.3d 735, 740 (8th Cir. 2002). However, a claimant may also bring an ERISA action to recover benefits against plan administrators. *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1194–95 (8th Cir. 1998); *Layes v. Mead Corp.*, 132 F.3d 1246, 1249 (8th Cir.1998). The proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan. *Hall*, 140 F.3d at 1194. As discussed infra, the party that controls the administration of the Plan is the Employee Benefits Committee, an agent of defendant. Relief can be granted against the Employee Benefits Committee as named administrator and then imputed to Qwest. *See* 29 U.S.C. § 1002(21)(A); *Kerns*, 992 F.2d at 216–17 (8th Cir.1993). Accordingly, the action may proceed against Qwest, but plaintiff will be granted leave to add the Plan as a party defendant if she so desires.

■ Because ERISA does not contain a statute of limitations for actions seeking to recover plan benefits or to clarify rights to future plan benefits under § 1132(a)(1)(B), or for actions alleging violations of 29 U.S.C. § 1054(g) and (h), this

court looks to state law for the most analogous statute of limitations. *See Adamson v. Armco, Inc.,* 44 F.3d 650, 652 (8th Cir. 1995). The most analogous state statute of limitations would be that of Colorado, for actions upon a written contract, which provides a three-year statute of limitations. *See* Colo.Rev.Stat. Ann. § 13–10–101; *Johnson v. State Mut. Life Assurance Co. of Am.,* 942 F.2d 1260, 1263 (8th Cir.1991) (en banc) (ERISA suit "should be characterized as a contract action for statute of limitations purposes"). Despite determining the limitations period by analyzing state law, this court looks to federal common law to determine the time at which a plaintiff's federal claim accrues. *See Union Pacific R.R. Co. v. Beckham,* 138 F.3d 325, 330 (8th Cir.1998).

■ In a federal question case, and in the absence of a contrary directive from Congress, the "discovery rule," according to which a plaintiff's cause of action accrues when he discovers, or with due diligence should have discovered, the injury that is the basis of the litigation, is used to determine when a plaintiff's federal claim accrues. *Id.* Consistent with the discovery rule, the general rule in an ERISA action is that a cause of action accrues after a claim for benefits has been made and has been formally denied. *Id.* As noted above, the claim was formally denied in 2001. Accordingly, the court finds Woods's ERISA claim, directed to Qwest's alleged breach of fiduciary duty in declining to credit her for her 1969 employment in 2000 is timely.

Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is denied.