**Christine ANDERSON, Plaintiff,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

**No. 3:07–cv–00097 RP–RAW.**

United States District Court,
S.D. Iowa,
Davenport Division.

Jan. 12, 2009.

---

Mark R. Fowler, Gomez May Cartee & Schutte, Davenport, IA, for Plaintiff.

Elizabeth A. Coonan, Michael A. Dee, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Des Moines, IA, for Defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendant's, Nationwide Mutual Insurance Company ("Nationwide"), Motion for Summary Judgment, filed on August 27, 2008. Clerk's No. 16. Plaintiff, Christine Anderson ("Anderson"), filed Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment on October 7, 2008. Clerk's No. 22. Nationwide filed its Reply Brief in Support of its Motion for Summary Judgment on

October 20, 2008. Clerk's No. 23. The matter is fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

Anderson was hired by Nationwide in 1997 as a Multiline Special Claims Representative I. Def.'s Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. (hereinafter "Def.'s Facts") ¶ 1. Anderson was eligible for coverage under the Nationwide Insurance Companies and Affiliates Disability Income Benefit Plan (hereinafter "Benefit Plan"). *See* Def.'s App. at 54. The Benefit Plan is an "employee benefit plan" covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. *See* Clerk's No. 9. "Disability" is defined within the Benefit Plan as:

"Disability" or "Disabled" means a disability or disablement that results from a substantial change in medical or physical condition as a result of Injury or Sickness and is prevented from engaging in Substantial Gainful Employment for which she is, or may become, qualified. Continuation of an existing medical or physical condition will generally not constitute a substantial change in medical or physical condition if Claimant has been able to engage in Substantial Gainful Employment, or such medical or physical condition could be or has been accommodated. A substantial change in medical or physical condition may be evidenced by the change or loss of at

---

1. Anderson does not contest the facts as submitted in Defendant's Statement of Material Facts and Appendix and did not submit a response to Defendant's Statement of Material Facts, a statement of additional facts, or an appendix containing evidence to support arguments made in her resistance brief. Instead, she relies exclusively on citations to Defendant's Appendix throughout her resistance brief. Local Rule 56(b) states: "The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact." Thus, the Court takes the facts as alleged by Nationwide to be admitted by Anderson.

least one of the Activities of Daily Living.

Def.'s Facts ¶ 47. "Substantial Gainful Employment" is defined as:

(a) For Active Associates who are not Eligible Statutory Employees, any occupation or employment from which an individual may receive an income equal to or greater than one-half of such individual's Covered Compensation as of her Date of Disability.

(b) For Active Associates who are not Eligible Statutory Employees, any occupation or employment from which an individual may receive an income equal to or greater than one-half of such individual's pre-disability income. Pre-disability income is equal to all income earned in the calendar year prior to the Date of Disability, regardless of source, i.e., including non-Nationwide employers, income reported on a W-2, on a 1099, etc. Upon request, the Plan Administrator will use the Eligible Statutory Employee's adjusted gross income as reported on Eligible Statutory Employee's Form 1040 for the calendar year prior to the Date of Disability.

*Id.* ¶ 48. The named plan administrator for the Benefit Plan is the Benefits Administration Committee (hereinafter "the Committee") and, as such, it is responsible for the payment of all benefits. Def.'s Facts ¶ 51; Def.'s App. at 74. The Committee is "established by the Board of Directors of the Plan Sponsor," and members are "appointed by the Board of Directors of the Plan Sponsor." Def.'s App. at 46. The Committee has the "powers and duties, . . . (a) To exercise discretion and authority to construe and interpret the provisions of the Plan, . . . , and enforce rules and regulations under the Plan . . . (b) To decide all questions as to the rights of Participants under the Plan and such other questions as may arise under the

plan." *Id.* at 74. The Committee may delegate administrative duties and an initial claim determination to another party, but an appeal from an adverse benefit determination will be considered by the Committee. *Id.* at 47.

As a Multiline Special Claims Representative I, Anderson was required to drive and sit at a computer with intermittent walking and standing. Def.'s Facts ¶ 1. It is unclear from the record when Anderson's back pain began, but documentation of medical care for Anderson's back starts following a back surgery, "a laminectomy at L4–5," performed by Dr. Roski in September 2002. *Id.* ¶ 3; Def.'s App. at 130. Following the surgery, on November 20, 2003, Anderson was referred to Dr. Timothy Millea ("Dr. Millea") and reported that she was experiencing pain across her low back that was radiating into her lower extremity. Def.'s Facts ¶ 4. On December 11, 2003, Anderson applied for and was granted disability benefits due to "persistent lower back pain" following the L4–5 laminectomy. *Id.* ¶ 7; Def.'s App. at 2. On December 23, 2003, an MRI of Anderson revealed a "small disc protrusion at L5–S1." Def.'s Facts ¶¶ 11–13; Def.'s App. at 127. Dr. Millea subsequently completed an Attending Physician's Statement reporting Anderson's back pain and concluding both that Anderson was totally disabled from performing her job and that it was undetermined when she could return to work. Def.'s App. at 1–3.

Anderson subsequently underwent physical therapy and acupuncture but developed other radicular symptoms and heel pain. Def.'s Facts ¶¶ 8–10. Anderson continued to consult with Dr. Millea as her symptoms increased and, in March 2004, she reported that she found it "quite difficult to sit." Def.'s App. at 125. On June 1, 2004, she consulted Dr. Dudley Davis ("Dr. Davis") at the Mayo Clinic who diag-

nosed Anderson with Arachnoiditis and stated that her prognosis was uncertain. Def.'s Facts ¶ 20; Def.'s App. at 93, 95, 97, 99. In June 2004, Dr. Millea stated in response to the diagnosis of Arachnoiditis in her lumbar spine that he "certainly did not have this opinion but certainly the possibility is a consideration since we have not made any further headway in her treatment otherwise." Def.'s App. at 124.

A disability case manager with GatesMc-Donald Disability Management Solutions ("GatesMcDonald") arranged for an Independent Medical Examination ("IME") of Anderson. Id. at 88–93. GatesMcDonald, according to its letters to Anderson, provided case management and claims administrative services for the Benefit Plan but foreswore any role in benefit determinations, which it stated were made at the discretion of Nationwide Insurance. Id. at 87, 90, 92. On June 10, 2004, Dr. Thomas Hughes ("Dr. Hughes") conducted the IME and diagnosed Anderson with "post lumbar discectomy" and "laminectomy at L4–5 left sciatica secondary to apparent disc herniation at L5–S1 with some residual S1 radiculopathy associated with an absent ankle jerk on the left side," "chronic arachnoiditis (non-surgical)," and "chronic pain syndrome." Def.'s Facts ¶¶ 21–22. Dr. Hughes wrote in his evaluation:

> At this point in time, it does not appear to be a practical consideration to attempt to direct Ms. Anderson return to work or substantial employment in virtually any capacity. She is simply not able to sustain any position for [a] long enough period of time to accomplish any kind of productive task. Travel, sitting at a desk, operating a computer, talking on the telephone and obtaining information and similar office duties seem to be beyond her work capacity at this time. She appears to be chronically sleep deprived and experiencing chronic pain that would preclude her from perform-

ing useful tasks for which she could be paid. This assessment might be subject to revision with a different line of treatment.

Id. ¶ 22. Dr. Hughes also noted that Anderson "seem[ed] to have some flattening of the affect and [he thought] there [were] some subtle mood changes, which [were] suggestive of some evidence of depression." Def.'s App. at 110.

Anderson was referred from the Mayo Clinic to the University of Iowa Hospitals and Clinics where, on July 1, 2004, Dr. Naeem Haider ("Dr. Haider") determined that Anderson had chronic low back pain and possible Arachnoiditis. Id. at 132, 134. On September 3, 2004, during a follow-up visit, Anderson reported improvements in her condition, though her back pain would "increase[ ] with periods of increased standing or sitting for long periods of time," and when her pain became extreme, she would "lay[ ] down with her leg pain, usually 2–3 times a day." Id. at 137. When she returned on January 7, 2005, Dr. Haider reported that she continued to experience these pain symptoms and also noted a concern that her medications were interfering with her concentration. Id. at 145.

Anderson consulted with Dr. Mark Lucas ("Dr. Lucas") about her foot pain on September 16, 2004. Id. at 121. An X-ray examination revealed "infracalcaneal spurs" and "joint-space narrowing about the talonavicular joints" on each foot. Id. Dr. Lucas diagnosed Anderson with heel spurs and plantar fascitis. Id. at 123. Anderson also consulted with Dr. Charles Saltzman ("Dr. Saltzman") of the University of Iowa Hospitals and Clinics regarding her foot pain between November 2004 and March 2005. Def.'s App. at 139, 144. She reported that she believed that her health was somewhat better than it had been a

year previously, but continued to report pain that increased when she sat for "very long." *Id.* During her initial visit, Dr. Saltzman observed "bilateral heel pain," "midfoot arthritis at the talonavicular joint," a "possible injury to her gastroc at the musculotendinous junction," and the need for "greater rehab on her right ankle." *Id.* at 143. In her follow-up visits with Dr. Saltzman, Anderson continued to show signs of foot and back pain, especially in her central heel. *Id.* at 144.

In early 2005, Anderson was in an automobile accident. *See id.* at 147, 149, 162, 172. While it is unclear if the accident caused any further injuries, Dr. Haider reported during an April 18, 2005 visit that Anderson's chronic back pain was exacerbated by the accident which, in turn, exacerbated her central heel pain. *Id.* at 150, 162. She was also referred by Dr. Saltzman to Dr. Joseph Chen ("Dr. Chen") for psychiatric trauma care. *Id.* at 147, 149. Dr. Chen reported Anderson's mental status as "appropriate mood, affect, and orientation" and diagnosed her with chronic pain syndrome on June 13, 2005. *Id.* at 156. In addition to the foot and back specialists, Anderson also continued to consult with Dr. Mark Hermanson ("Dr. Hermanson"), her primary care physician. *Id.* at 161–62. He reported on her ongoing struggle to minimize her reliance on medication while still effectively managing her pain. *Id.*

In April 2005, approximately one and one-half years after granting Anderson disability benefits, Nationwide Nurse Specialist Tom Dyer requested additional information concerning Anderson's permanent disability status from Dr. Hermanson and Dr. Haider. Def.'s Facts ¶¶ 40–41. Dr. Hermanson responded that Anderson was totally disabled from work and was expected to be off work for more than one year. *Id.* ¶ 40. Dr. Haider responded

that he was unable to answer Nationwide's questions because he did not perform Functional Capacity Evaluations. *Id.* ¶ 41.

On July 5, 2005, Nationwide requested another IME from Dr. Hughes to determine if Anderson continued to meet the definition of Disabled under the Benefit Plan. *Id.* ¶ 44; Def.'s App. at 164. During Anderson's IME on August 1, 2005, Dr. Hughes performed a physical examination of Anderson. Def.'s App. at 175–77. Dr. Hughes was "unable to provide a clear and definitive diagnostic categorization" and conjectured that "she might best fit into a generalized categorization as having a somatoform pain disorder." *Id.* at 178. He also noted that Anderson did not appear clinically depressed, that she had a neutral mood, normal affect and appropriate demeanor. *Id.* at 175. Dr. Hughes concluded in his evaluation:

> There is inadequate evidence that there is a specific structural or functional alteration that would constitute a substantial basis to warrant Ms. Anderson not being employable. I would offer that her choice not to pursue continued employment is one of her own election and seems reinforced by her symptomatology, but not reinforced by any clear objective evidence of injury or definable medical illness. She did previously have a disc herniation and she underwent surgery, but did not have a good result[;] however, I do not see that she has ongoing neuropathic changes that would warrant continued work absence. She subsequently has developed a number of clinical symptoms that would seem to reinforce her election not to return to work. For reasons as outlined above, she would not be considered "totally disabled" based on the plan definition of disability.

*Id.* at 180. Dr. Hughes noted that Anderson was able to perform administra-

tive, clerical, and usual activities of daily living and activities routinely engaged in for business purposes. *Id.*

On September 14, 2005, Dr. Hermanson completed an Attending Physician's Statement at Nationwide's request, stating that Anderson was not totally disabled from work, but declining to release her to return to work. *Id.* at 188. Dr. Hermanson handwrote on the questionnaire, "This is a very complex case that I do not feel comfortable evaluating myself. Many of her limitations are related to subjective pain complaints that I can't measure. I have no reason to not believe her complaints, however, as she has no history of malingering in the past. I advise getting specialist evaluation." *Id.*

At Nationwide's request, on October 3, 2005, Lynn Kaufman ("Kaufman"), a labor market expert, issued a Labor Market Access and Earning Capacity Report (hereinafter "Labor Market Report") that considered the job description for Multiline Special Claims Representative I, demographic data, and medical reports from Dr. Hermanson, Dr. Hughes, and Dr. Haider. *Id.* at 184. Kaufman summarized Dr. Hermanson's and Dr. Hughes' medical opinions in describing Anderson's "Residual Functional Capacity." *Id.* at 184. In assessing Anderson's "Occupational Information & Outlook," Kaufman set forth the skills required for Anderson's former position as a Multiline Special Claims Representative I. *Id.* at 187. Kaufman concluded that there were several jobs which used those or similar skills and required only sedentary to light

strength in the Davenport–Moline–Rock Island Metropolitan Statistical Area. *Id.* The jobs identified by Kaufman were: bookkeeping, accounting, and auditing clerks; customer service representatives; cost estimators; and insurance claims and policy processing clerks. *Id.* The wages for these jobs varied from $26,686.40 to $53,248.00 annually.[2] *Id.*

On October 14, 2005, Anderson received a letter informing her that her benefits would terminate as of midnight on November 4, 2005. *Id.* at 189a. The letter reported that her claim had been reviewed by the Disability Assessment Committee and that they had determined that she no longer qualified for benefits under the Benefit Plan.[3] *Id.* The letter cited the August 1, 2005 IME by Dr. Hughes and the October 3, 2005 Labor Market Report by Kaufman as the basis for its determination that Anderson did not meet the definition of Disability under the Benefit Plan. *Id.* at 189b.

On April 7, 2006, Anderson appealed the October 14, 2005 decision to deny her disability benefits. *Id.* at 190. With her appeal request, Anderson provided to Nationwide:

- A list of twelve medications prescribed to Anderson, seven of which she was actively taking, as well as several recommended physical therapy activities;

- A letter from Dr. Hermanson, dated April 4, 2006, stating Anderson could not maintain a job that required eight hours of concentration, mental alert-

**2.** It appears Anderson earned $49,785 annually, reduced by $1,320 for a company vehicle, as a Multiline Special Claims Representative I for Nationwide. *See* Def.'s App. at 212.

**3.** The termination letter was signed by Karen Muetzal, who it appears from earlier correspondence is an employee of GatesMcDonald. *See Id.* at 166. It is unclear to the Court,

from either the facts presented or the briefs, whether the Disability Assessment Committee is a committee within Nationwide or perhaps was a committee within GatesMcDonald, to which the Committee as plan administrator delegated the responsibility of making the initial claim determination.

ness, or continuous sitting because of her wide range of illnesses and complications, including depression and required medication;

- A new prescription for an anti-depressant from Dr. Hermanson, dated April 4, 2006;
- A job description, presumably the Multiline Special Claims Representative I position;
- Page one of a six page psychological assessment of Anderson, dated November 15, 2005, performed by the University of Iowa Hospitals and Clinics, showing indications of moderate depression;
- Anderson's resume;
- A January 6, 2006 report from Quad City Rheumatology, S.C., signed by Physician Assistant Darcy Anderson, stating Anderson had "symptoms of fibromyalgia, and a finding of early osteoarthritis .... [and] a history of degenerative joint disease of the lumbosacral spine"; and
- A description of Arachinoiditis from the Spine Universe webpage.

*Id.* at 190–209. In Anderson's appeal of the denial of benefits, she commented on Dr. Hughes' two IME exams, noting that they had lasted a total of two hours. *Id.* She urged the Committee to consider a vocational opinion by Roger Marquardt ("Marquardt"),[4] medical opinions provided by Dr. Hermanson, Dr. Millea, Dr. Haider, Dr. Davis, and a Dr. Drzybl, as well as evidence in Dr. Hughes' IMEs that supported Anderson's claim. *Id.* at 190a–191. She also challenged "the idea that she

[was] employable within the Quad Cities at a salary of 50% of what she was making before." *Id.* at 192. She argued that because of "her age, limited experience and education, extensive physical restrictions and impaired mental concentration levels due to pain," she was effectively unemployable in her job market. *Id.*

At the request of the Nationwide case manager, a whole body Functional Capacity Evaluation ("FCE") was performed on July 12, 2006 by Rock Valley Industrial Therapy ("Rock Valley"). Def.'s Facts ¶ 58. The FCE tested Anderson's dynamic strength, position tolerance, and mobility. In addition, an endurance assessment measured the change in Anderson's heart rate when repeating three physical tasks, specifically designed to "examine work tolerance to the 8–hour day." Def.'s App. at 226–34. Based on Anderson's performance, the FCE concluded Anderson was capable of "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly" and stated that Anderson was "capable of sustaining the Light level of work for an 8–hour day." Def.'s App. at 226, 232. The FCE also commented that Anderson was "self-limited 75% of the 12 tasks." *Id.* at 226. "Possible causes of self-limiting behavior include: 1) Pain, 2) Psychosocial issues such as fear of reinjury, anxiety, depression, and/or 3) Attempts to manipulate test results." *Id.* The FCE concluded from Anderson's test performance that there were no inconsistencies in the self-limiting behavior. *Id.* at 232.

---

4. This report was not included with Anderson's initial appeal letter. On April 24, 2006, Anderson sent the Committee Marquardt's report, which referenced Dr. Hermanson's determination that Anderson could not maintain any job that required eight hours of sitting and/or concentration and mental alertness and opined that "the present combination of impairments and resulting physical and mental residuals as understood eliminate [Anderson] from working and earning money in any competitive occupation." *Id.* at 211–13, 216.

The Nationwide case manager also requested an addendum from Dr. Hughes considering the FCE results and supplementing his previous IME reports. Def.'s Facts ¶ 59. On August 17, 2006, after reviewing the FCE, Dr. Hughes concluded Anderson was capable of sustaining a light level of work for an eight-hour work day, stating:

> Ms. Anderson is physically capable of resuming useful and productive employment in her prior work capacity. The fact that she has not returned to work seems to be that of a personal election and not based on obvious concerns for injury or physical harm; and, in fact, I would find it quite unlikely that the condition of Anderson would be exacerbated by her work activities. The basic conclusion would be that Ms. Anderson is fit and capable of performing substantially gainful employment of the character that she had done previously.

*Id.* ¶ 59.

On August 23, 2006, the Committee issued its decision to deny Anderson's appeal for reinstatement of benefits, stating it had considered:

- Anderson's letter of appeal;
- The disability case management notes;
- The August 1, 2005 IME by Dr. Hughes;
- The October 3, 2005 Labor Market Report by Kaufman;
- Dr. Hermanson's medical records;
- The July 12, 2006 FCE by Rock Valley Industrial Therapy;
- The August 17, 2006 addendum report by Dr. Hughes; and
- The terms of the Benefit Plan.

Def.'s App. at 243. In explanation of its denial, the Committee stated:

> ... in the definition of Disabled, [Anderson's] illness must prevent her

from engaging in Substantial Gainful Employment. Substantial Gainful Employment ... means "any occupation from which an individual may receive an income equal to or greater than one-half of such individual's Covered Compensation as of the date of disability.["] According to the [Labor Market Report], there are multiple positions within [Anderson's] current level of function that pay greater than 50% of her pre-disability earnings. The [Labor Market Report] identified sedentary positions for which she has transferrable skills. The FCE demonstrated that [Anderson] has the capacity to exert 20 pounds of force on an occasional basis and 10 pounds on a frequent basis. This report concluded that [Anderson] is capable of sustaining light level of work activities for an eight-hour workday; and is physically capable of resuming useful and productive employment in her prior work capacity. Based on these documents, the [Committee] determined that [Anderson] does not meet the definition of [D]isabled as defined by the [Benefit] Plan provisions.

*Id.* at 244. The Committee advised Anderson that she had exhausted her appeal rights under ERISA. *Id.*

On September 20, 2007, Anderson filed a lawsuit against Nationwide for breach of contract and bad faith failure to pay benefits in Scott County, Iowa. *See* Clerk's No. 1. Nationwide filed a Notice of Removal and a Motion to Dismiss. *Id.* This Court granted the Motion to Dismiss on Anderson's state law claims and for extra-contractual relief, finding preclusion under ERISA. Clerk's No. 9. The only remaining issue is Nationwide's denial of disability benefits under ERISA.

Defendant's Motion for Summary Judgment alleges that Plaintiff cannot show that the plan administrator abused its dis-

cretion in denying payment of disability benefits pursuant to the Benefit Plan on the present facts. Plaintiff argues that Nationwide acted arbitrarily and capriciously when it did not provide a rationale for relying on certain evidence and opinions over other conflicting medical opinions and by relying on an expert vocational report that did not account for the Plaintiff's age, pain, or ability to work. In addition, Anderson argues that a conflict of interest exists because Nationwide administers, as well as insures, its own Benefit Plan, and this conflict creates a genuine issue of fact as to whether the denial of benefits was arbitrary and capricious.

## II. STANDARD OF REVIEW

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.*; *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990).

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have issues to try,"

*Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried," *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of*

*Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and designate specific facts by affidavits or by the depositions, answers to interrogatories, and admissions on file, showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

■ "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998) (citing 29 U.S.C. § 1132(a)(1)(B)). In a case such as this, where the Plaintiff does not dispute that the Committee, as administrator of the Benefit Plan, possessed discretionary authority to determine eligibility for benefits, the Court reviews the Committee's decision for abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Groves v. Metro. Life Ins. Co.,* 438 F.3d 872, 874 (8th Cir.2006) ("If the benefit plan gives discretion to the plan administrator, then we review the plan administrator's decision for an abuse of discretion. We reverse the plan administrator's decision only if it is arbitrary and capricious.") (internal quotations and citations omitted).

### A. Conflict of Interest

■ Anderson argues Nationwide's decision to deny her disability benefits was arbitrary and capricious, or an abuse of discretion, because Nationwide's dual role as plan administrator and insurer creates an inherent financial conflict of interest. In *Metropolitan Life Insurance Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008), the Supreme Court held that for ERISA purposes, a conflict exists where the employer both funds the plan and evaluates the claims, including instances where the plan administrator is also a professional insurance company. The Supreme Court also reaffirmed, as previously set forth in *Firestone,* that a deferential standard of review is applicable where a plan administrator is given discretionary decision-making authority by an ERISA plan and that a "conflict should be weighed as a 'factor in determining whether there is an abuse of discretion.'" 128 S.Ct. at 2350 (citing *Firestone,* 489 U.S. at 115, 109 S.Ct. 948). In *Glenn,* the Court held that "conflicts are but one factor among many that a reviewing judge must take into account." *Id.* at 2351. "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.; see also Wakkinen v. UNUM*

*Life Ins. Co. of Am.*, 531 F.3d 575, 582 (8th Cir.2008) (weighing, amongst other factors, whether the conflict of interest acted as a tiebreaker). The weight given the conflict will be greater "where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 2351. Such circumstances include cases where there is "a history of biased claims administration" or there is evidence of "procedural unreasonabilities." *Id.* at 2351–52. But where "the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision[-]making irrespective of whom the inaccuracy benefits," the reviewing court will place less importance on the conflict. *Id.* at 2351.[5]

■ Contrary to Nationwide's contention that there is no evidence of a conflict of interest, applying *Glenn*, a conflict of interest is evident based on the fact that Nationwide serves as both the plan administrator and the insurer of the Benefit Plan. *See Glenn*, 128 S.Ct. at 2349; *see also Wakkinen*, 531 F.3d at 581 (noting "the Supreme Court has recently held that a plan administrator which both evaluates claims for benefits and pays benefit claims . . . is operating under a conflict of inter-

est"). Nationwide purports that because the Committee itself does not have a financial stake in the claims process, there is no conflict. Yet, based on the Court's reading of the Benefit Plan, the Committee is a committee within the larger corporate entity of Nationwide, and Nationwide brings forth no evidence suggesting otherwise.[6] Further, Nationwide offers no explanation of how the Committee stands unaffected by the company's financial interests. From the terms of the Benefit Plan, it is evident that the Committee is responsible for both evaluating claims and paying benefits. While the use of a committee structure has the potential to allow Nationwide to "wall off" claims administrators from those interested in firm finances, nothing in the record suggests that such measures were undertaken. The Court is not persuaded that simply placing the appointment process for an internal committee in the hands of the Board of Directors is sufficient to obviate the conflict of interest that arises when the same entity both insures and administrates an ERISA plan.

■ Anderson presents no evidence of systematic bad faith denials or pressure from Nationwide management to deny meritorious disability claims, but as discussed below, the record reveals procedural deficiencies that justify placing more

---

**5.** Anderson does not ask the Court to apply the less deferential "sliding-scale" standard of review used by the Eighth Circuit pre-*Glenn* when evaluating conflicts of interest in ERISA cases. Nevertheless, Nationwide includes a discussion of this legal standard in it arguments. *Woo*, 144 F.3d at 1160–61; Def.'s Reply at 11. Under *Woo*, a court would only weigh a conflict in its analysis if a plaintiff could show that the conflict caused a serious breach of the plan administrator's fiduciary duty. *Woo*, 144 F.3d at 1160–61 (citing *Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 900 (8th Cir. 1996)). This restrictive standard is not compatible with the more inclusive "one of sever-

al factors" approach in *Glenn* and, thus, is no longer applicable for ERISA conflict of interest analysis. *Cf. Wakkinen*, 531 F.3d at 582 (stating in reference to the plaintiff's assertion of procedural irregularities that "[we] continue to examine this claim under *Woo* [ ]").

**6.** As Anderson points out, the final benefit determination letter denying Anderson's claim to disability benefits was on Nationwide letterhead and signed "Nationwide Benefits Administrative Committee," suggesting that the Committee is not an entity independent of Nationwide.

weight on the conflict.[7] On this record, the Court finds that the existence of a conflict of interest should be given importance when it is weighed as one factor, among other relevant factors, in considering if Nationwide acted arbitrarily and capriciously in denying Anderson disability benefits.[8]

### B. *Full and Fair Process*

Nationwide argues that it did not abuse its discretion when it denied Anderson's benefits, citing its thorough review of Anderson's medical records and the evidence in support of its decision. Anderson counters that Nationwide's decision to deny her disability benefits was arbitrary and capricious, specifically faulting Nationwide's lack of explanation as to how it weighed the medical evidence and Nationwide's reliance on a non-comprehensive vocational report.[9]

Nationwide would have the Court begin its examination with a consideration of whether its denial of benefits was reasonable as a decision supported by substantial evidence, but inherent in Anderson's challenge is an assertion that the process employed by the Committee failed to provide the full and fair review required by ERISA. Before reaching the question of whether the Committee's decision was supported by substantial evidence, the Court considers whether the Committee's evaluation of Anderson's claim was arbitrary and capricious for failing to provide a full and fair review.

ERISA provides for an administrative claims procedure that was intended to provide a non-adversarial method of claims settlement that allows trustees freedom to operate without rigid formality, yet also protect plan participants from arbitrary or unprincipled decisions. *See Weaver v. Phoenix Home Life Mut. Ins. Co.,* 990 F.2d 154, 159 (4th Cir.1993). To this effect, ERISA requires that benefit plans:

7. Anderson also argues that Nationwide acted arbitrarily and capriciously because it knew of Anderson's application for Social Security Administration ("SSA") disability benefits and encouraged her to make the application. Anderson admits that the SSA determination, which granted her disability benefits, was not available until after the Committee made its decision, thus, the Committee could not have considered the SSA award. Nevertheless, she argues that Nationwide's encouragement that she apply for SSA disability benefits is "blatantly inconsistent" with its decision to deny her disability benefits under the ERISA plan. First, Nationwide contests Anderson's assertion that it encouraged her to apply for SSA benefits, and Anderson has not presented any evidence supporting the claim. Because Plaintiff's argument wholly lacks factual support, she has failed to demonstrate that a genuine issue of material fact exists as to Nationwide's treatment of her SSA claim. Further, the Eighth Circuit has held repeatedly that SSA and ERISA disability determinations differ and a "determination that [a claimant] suffers from a pain-based disability under Social Security regulations does not

require [a plan administrator] to reach the same conclusion." *Coker v. Metro. Life. Ins. Co.,* 281 F.3d 793, 798 (8th Cir.2002).

8. Nationwide also asserts that "any conflict that may have existed is obviated by the Plan Administrator's thorough review of all records and use of independent experts." Def.'s Reply Br. at 13. This argument is unpersuasive since neither a thorough reading of the record, nor the use of independent experts reduces, much less obviates, the likelihood that an entity's financial interest in denying a borderline claim will affect the weighing of the evidence on the record during a claim determination. *See Glenn,* 128 S.Ct. at 2349.

9. Nationwide consistently references the abuse of discretion legal standard and Anderson consistently refers to the legal standard as arbitrary and capricious. In the Eighth Circuit, the abuse of discretion standard and the arbitrary and capricious standard are equivalent. *See Schatz v. Mut. of Omaha Ins. Co.,* 220 F.3d 944, 947 n. 4 (8th Cir.2000)

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. In addition, Department of Labor regulations require:

Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.

29 C.F.R. § 2560.503–1(h)(1) (2008). As explained in further detail below, the Court concludes that the claims procedure applied by the Committee failed to provide Anderson with the full and fair review guaranteed by ERISA in two independent, yet interrelated, manners.

### 1. *Inadequate notification.*

 When the plan administrator makes a negative benefit determination on appeal, it must provide notification that includes "[t]he specific reason or reasons for the adverse determination." *Id.* at § 2560.503–1(j)(1). "ERISA and its accompanying regulations essentially call for a 'meaningful dialogue between the plan administrators and their beneficiaries.'" *Abram v. Cargill, Inc.,* 395 F.3d 882, 886 (8th Cir.2005) (citing *Booton v. Lockheed Med. Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997)). To this end, the plan administrator must "set out in opinion form

the rationale supporting their decision so that [the claimant can] adequately prepare himself for any further administrative review, as well as an appeal to the federal courts." *Richardson v. Cent. States, Se. & Sw. Areas Pension Fund,* 645 F.2d 660, 665 (8th Cir.1981). The statement must include a brief statement of the facts of the case and the rationale for the decision. *Brumm v. Bert Bell NFL Ret. Plan,* 995 F.2d 1433, 1436–37 (8th Cir.1993) (citing *Richardson,* 645 F.2d at 665). Conclusory statements are not sufficient to fulfill the full and fair review requirement. *See Richardson,* 645 F.2d at 665 ("Bald-faced conclusions do not satisfy [ERISA's procedural] requirement.").

 The Committee's final determination letter is problematic because, though it set forth the evidence that it reviewed, noted the relevant portions of the Benefit Plan, and specifically pointed to the two documents it relied upon in making its decision, it fails to list the relevant facts of Anderson's claim and subsequently fails to provide a rationale of how the two cited documents support its decision to terminate Anderson's disability benefits given these facts. At no point does the letter acknowledge, much less address, Anderson's contentions that "extensive physical restrictions and impaired mental concentration" effectively meant she was unemployable in her job market. Instead, after listing the material reviewed by the Committee, the final determination letter summarizes the conclusions of the FCE and the Labor Market Report and conclusorily states that "[b]ased on these documents, the Committee determined that [Anderson] does not meet the definition of disabled as defined by the [Benefit] Plan provisions." Def.'s App. at 244.

 Because the notification does not set forth the relevant facts, it does not contain sufficient detail by which

Anderson, or this Court, can surmise why the administrator found Anderson's evidence and arguments unpersuasive. *See Davidson v. Prudential Ins. Co. of Am.,* 953 F.2d 1093, 1095 (8th Cir.1992) (holding detailed explanations of the decision to deny continuing LTD benefits ensured the claimant had adequate notice of why his claim was denied, how to seek review of the decision, and what additional information would assist in the review process). In cases such as this, when the claimant has pointed to evidence existing in the record and brings forth additional specific evidence of complicating medical and psychological factors not adequately taken into account by prior documentation, the plan administrator should note these claims and explain why none of the factors, either individually or in combination, qualify the claimant for disability benefits under the Benefit Plan. In addition, where the definition of Disabled requires both a medical and a vocational assessment, such as Nationwide's Benefit Plan, a reasoned explanation of how the medical and vocational evidence coincide will assist the claimant and any reviewing court to understand the basis for the plan administrator's determination that the claimant is capable of engaging in the specified employment. *See Torres v. UNUM Life Ins. Co. of Am.,* 405 F.3d 670, 678 (8th Cir.2005) (finding that the plan administrator's failure to conduct a vocational evaluation resulted in a unreasonable decision given the benefit plan's terms); *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan,*

874 F.2d 496, 499 (8th Cir.1989) (requiring expert vocational evidence in addition to medical evidence when the benefit plan's definition of disabled hinges on the claimants ability to be gainfully employed). In this case, the Committee should explicitly address, given the challenges she faces in sitting and concentrating, whether Anderson is able to perform the positions listed in the Labor Market Report.[10] This is not to say that the Committee must set forth each of Anderson's contentions in detail and describe the amount of weight it places on each of the medical opinions in the record. Where a summary of the facts and the recitation of the administrator's rationale adequately communicates why the claim was denied, ERISA's notification requirement will be satisfied. In this case, however, the lack of a factual summary and the perfunctory recitation of documents as the basis for denying the appeal is insufficient to constitute adequate notice under ERISA.

### 2. *Consideration of evidence.*

 Underlying the inadequacy of notification is the Committee's apparent failure to consider the effect of Anderson's pain, depression, and medications on her ability to work. When a claimant appeals a denial of benefits, ERISA's full and fair review also requires "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was

---

**10.** Anderson also challenged Nationwide's use of Kaufman's Labor Market Report, arguing that the Labor Market Report is faulty because it did not give greater consideration to Anderson's medical limitations. Neither the Labor Market Report, nor Nationwide's reliance on it, would be unreasonable unless the medical evidence does not support reliance on the vocational information in the Labor Market Report. *See Gerhardt v. Liberty*

*Life Assurance Co. of Boston,* No. 06–1595, 2008 WL 2476692, at *15–17 (E.D.Ark. June 17, 2008) (finding no fault with the vocational report itself but remanding to the plan administrator to consider whether the medical evidence regarding the claimant's mental capacity and age affected her ability to perform the substantial duties of the occupations identified in the vocational report).

submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). An administrator may not ignore relevant medical evidence in the records before it. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("Plan Administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *see also Abram*, 395 F.3d at 887 (remanding to the administrator to address whether the claimant's other syndromes were disabling in total when the record suggested multiple medical causes for the claimant's symptoms). There is a limited duty to investigate and gather information on a claimed medical condition before denying coverage. *Compare Grossmuller v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am., UAW, Local 813*, 715 F.2d 853, 858 n. 5 (3d Cir.1983) (" 'Full and fair' ... may impose upon [the decision-maker] the duty to develop a complete and impartial record."), *and Brown v. Ret. Comm. of the Briggs & Stratton Ret. Plan*, 575 F.Supp. 1073, 1076 (E.D.Wis.1983) ("The committee cannot insulate its decision from review simply by developing a one-sided record. Rather, it has a limited duty to employ fair procedures and, if necessary, to investigate evidence bearing upon the claim."), *with Ford v. Metro. Life Ins. Co.*, 834 F.Supp. 1272, 1280 n. 12 (D.Kan.1993) ("The claimant has an affirmative duty to present to the claims administrator any evidence she wants the administrator to consider."). Though potentially difficult to diagnose, chronic pain, depression, and complications due to medications may be disabling alone, or in combination, and the plan administrator has a duty to investigate such claims. *See Woo*, 144 F.3d at 1161 (concluding the administrator failed to use proper judgment by not having an expert review the claimant's difficult to diagnose claim); *Tor-*

*res*, 405 F.3d at 680–81 (finding the plan administrator's failure to consider the side effects of medicine prescribed to the claimant was unreasonable); *Abram*, 395 F.3d at 887 (requiring the plan administrator to consider on remand the effects of the claimant's depression and obesity both individually, and in combination, with the claimant's post-polio syndrome); *see also Torgeson v. Unum Life Ins. Co. of America*, 466 F.Supp.2d 1096, 1133–34 (N.D.Iowa 2006) (finding that the plan administrator abused its discretion in failing to consider the combined effect, or "comorbidity," of the claimant's fibromyalgia, depression, and fatigue).

Here, there is no evidence in the record that the Committee gathered any information on the complicating factors of Anderson's pain, medications, and psychological state when it investigated her claim. These complaints were detailed in Anderson's appeal and were supported by evidence in the record, invoking the Committee's duty to investigate and develop the record. Yet, the only additional medical opinions, the Rock Valley FCE and Dr. Hughes' addendum report, gathered by the Committee did not purport to consider whether these medical factors were present, nor how these factors might interact with the strength and mobility tests they implemented. Neither report examined Anderson's ability to concentrate, nor did they discuss how Anderson's pain, medications, and psychological state would affect Anderson's ability to work in the type of administrative or clerical position noted in the Labor Market Report. Based solely on a heart rate endurance assessment and an ability to lift weights, the FCE concluded that Anderson was able to sustain a light level of work for an eight hour day. Dr. Hughes' August 1, 2005 IME concluded Anderson was not Disabled based solely on Anderson's physical state and his ad-

dendum report only reiterated his previous conclusion that Anderson could work by performing light and sedentary work in an office setting after reviewing the FCE. The record indicates that the Committee made no attempt to gather information on Anderson's ability to concentrate and that any assessments of her ability to sit were submerged within generalized physical assessments.

In addition, there is no indication that the Committee gave any consideration to Anderson's complicating medical factors in light of evidence previously entered into her medical record despite Anderson's detailed discussion of supporting evidence in the record. While the final termination letter stated that the Committee had reviewed all the documents in Anderson's medical file, the letter made no mention of Anderson's pain, medications, and psychological state and relied solely on the FCE, which did not address the complicating factors or any bearing they might have on Anderson's capacity to work. Further, none of the other letters from the Committee or Nationwide's claim representatives acknowledge or provide any reasoning for rejecting the potentially disabling effects of Anderson's pain, depression, or medications. In sum, the record contains no evidence that the Committee considered whether a person with Anderson's complaints of pain and inability to concentrate could be employed in the positions listed in the Labor Market Report.

 Nationwide notes that " 'when a conflict in medical opinion exists, the plan administrator does not abuse his discretion by adopting one opinion, if reasonable, and finding that the employee in not disabled.' " Def.'s Reply at 5 (citing *Smith v. UNUM Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir.2002)). But here, if one probes beneath Dr. Hermanson's conclusion that Anderson cannot work eight hours and Dr. Hughes' and Rock Valley's assessments that Anderson was physically capable of performing light or sedentary work for eight hours, one finds that they, in fact, assess different aspects of Anderson's ability to work and, thus, do not directly conflict. Both Dr. Hughes and Rock Valley focused on Anderson's physical strength and endurance, whereas Dr. Hermanson considered Anderson's physical limitations, in combination with her mental limitations. A plan administrator's choice to adopt the conclusion of a restricted medical assessment while ignoring a more encompassing medical assessment, which is supported by other evidence in the record, is not one to which a reviewing court should defer. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 136–37, 2008 WL 5377680, at *9–10 (2d Cir.2008) (concluding it was unreasonable for the plan administrator to rely on one medical report in support of its denial to the detriment of a more detailed contrary report without further investigation). Such a high degree of deference would effectively make a reviewing court no more than a rubber stamp for the plan administrator's decision. *See Torres*, 405 F.3d at 680 ("Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result."); *see also Richardson*, 645 F.2d at 665 ("The [ERISA] statute and the regulations ... were not intended to be used by the [Plan Administrator] as a smoke screen to shield itself from legitimate claims.").

The conclusory reasoning provided in the Committee's denial letter does not indicate that the Committee considered Dr. Hermanson's assertions that Anderson was disabled from working an eight-hour day because of her physical limitations, in combination with her mental limitations. Further, the record before the Court

clearly indicates a need for further investigation and consideration of Anderson's evidence that her foot and back pain is complicated by her medications and psychological state. By denying Anderson's appeal with what appears on its face to be a complete disregard for relevant medical evidence submitted with the appeal, Nationwide has failed to satisfy the process requirements of ERISA which require a full and fair review, a failure that is especially concerning given Nationwide's financial conflict of interest. *See McCauley,* 551 F.3d at 136, 2008 WL 5377680, at *9 (noting the likelihood that the plan administrator's financial conflict of interest motivated its failure to investigate the medical complications reported by the claimant).

When a plan administrator fails to comply with ERISA's procedural requirements and the record requires expansion, the appropriate remedy is to remand the claim determination to the plan administrator to re-open the record and provide a full and fair review. *See Abram,* 395 F.3d at 887 ("A reviewing court must remand a case when the court or agency fails to make adequate findings or explain the rationale for its decision."); *see also Krauss v. Oxford Health Plans, Inc.,* 517 F.3d 614, 630 (2d Cir.2008) ("A full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review."). To comply with ERISA and its implementing regulations, a "full and fair review" of Anderson's claim must provide a through review of all relevant information submitted on a claim and a notification that states the specific reasons for the adverse determination. This full and fair review should specifically consider Anderson's arguments and evidence that her pain, complicating medications, and depression affect her ability to obtain the jobs identified by the Committee in the Labor Market Report and her ability to maintain an eight hour work day, five days a week in those positions.

## C. *Proper Party*

Nationwide also alleges that it is not a proper party and requests that if this motion for summary judgment is denied, the Committee be substituted as Defendant. Plaintiff brought this suit under 502(a)(1)(B) of ERISA, which creates a cause of action for recovery of benefits under a benefit plan. 29 U.S.C. § 1132(a)(1)(B). Neither 502(a)(1)(B), nor any other section of ERISA, sets forth who is a proper defendant in such suits. *See id.* The party ordinarily liable for paying out benefits under the terms of the plan is the primary defendant in a 502(a)(1)(B) action. *Ross v. Rail Car Am. Group Disability Income Plan,* 285 F.3d 735, 740 (8th Cir.2002). Nationwide cites *Hall v. Lhaco, Inc.,* 140 F.3d 1190, 1194 (8th Cir.1998) (quoting *Layes v. Mead Corp.,* 132 F.3d 1246, 1249 (8th Cir.1998)), in support of the proposition that "the proper party against whom a claim for ERISA benefits may be brought 'is the party that controls the administration of the plan'; not the plan participant's employer," placing emphasis on the final phrase "not the plan participant's employer."

Contrary to Nationwide's assertion, in *Hall,* the Eighth Circuit held that an insurer-plan administrator, such as Nationwide, may be a proper defendant where the insurer is the sole administrator of the benefit plan. *Hall,* 140 F.3d at 1195. The holding of *Layes,* for which it was cited in *Hall,* is more accurately stated as: an employer that does not control plan administration is not a proper defendant for an ERISA section 502(a)(1)(B) suit. *See Layes,* 132 F.3d at 1249 ("The proper party defendant in an action concerning

ERISA benefits is the party that controls administration of the plan.") (quoting *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997)). Nationwide's status as Anderson's former employer cannot automatically remove it from reach of a suit to recover benefits under ERISA. *Cf. Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir.1988) ("Unless an employer is shown to control administration of a plan, it is not a proper party defendant in an action concerning benefits.").

 As the named plan administrator in the Benefit Plan, the Committee is a proper defendant in a suit for ERISA benefits, but at least one sister district court has found that under federal common law of agency, relief can be granted against an internal committee, which was named as administrator, and then imputed to the larger corporate entity. *Woods v. Qwest Info. Tech.*, 334 F.Supp.2d 1187, 1194–95 (D.Neb.2004). In addition, while the question of whether "a party other than the one designated in ERISA plan documents can be sued under § 502(a)(1)(B)" was left open by the Eighth Circuit Court of Appeals in *Hall*, 140 F.3d at 1195, several district courts in the Eighth Circuit have agreed that a party's actual role in an ERISA plan, rather than its named role, will determine whether it administered the plan and, thus, whether it can be as a named defendant in a section 502(a)(1)(B) suit. *See Adams v. Gen. Elec. Co.*, No. 06–3303, 2006 WL 2990329, at *1–2 (W.D.Mo. Oct. 18, 2006); *Price v. Xerox Corp.*, 379 F.Supp.2d 1026, 1028 (D.Minn.2005); *Copeland v. Aetna Life Ins. Co.*, No. 04–1563, 2005 WL 2807044, at *2 (E.D.Mo. Oct. 27, 2005).

 Here, Nationwide has not presented facts demonstrating that the Committee alone made the appeal decision, nor has it provided any argument that it cannot be named as a defendant either under agency law or as a de facto plan administrator. With no facts in the record, beyond the bare terms of the Benefit Plan, as to who controls the administration of the Benefit Plan, the Court will not substitute the Committee for Nationwide as the named Defendant over Anderson's objections. *See Price*, 379 F.Supp.2d at 1028 (D.Minn. 2005) (finding where "[n]either party has shown which defendant or defendants control administration of the LTD Plan or in fact administers the LTD Plan ... the court cannot determine ... whether defendants are properly named"). Nevertheless, the Court grants the plaintiff leave to amend her complaint to name the Committee as a defendant if she so desires.

## IV. CONCLUSION

For the reasons stated above, Nationwide's Motion for Summary Judgment (Clerk's No. 16) is DENIED. The matter is remanded to Nationwide's Benefits Administration Committee. In reconsidering Anderson's appeal of the denial of her disability benefits, the administrative record should be re-opened to determine whether Anderson's pain, complications from her medications, and psychological factors alone, or in combination with her physical limitations, preclude Anderson from engaging in Substantial Gainful Employment.

IT IS SO ORDERED.